IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


JESSIE LOBBINS                          )
                                        )
v.                                      )     No. 3:15-00618
                                        )     JUDGE CAMPBELL
UNITED STATES OF AMERICA                )


MEMORANDUM

Pending before the Court is a Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or

Correct Sentence By A Person In Federal Custody (Docket No. 1), filed by the

Movant/Petitioner, pro se. The Government has filed a Response (Docket No. 9), and the

Petitioner has filed a Reply (Docket No. 10).

For the reasons set forth herein, Petitioner's Motion To Vacate (Docket No. 1) is

DENIED, and this action is DISMISSED.

II. Procedural and Factual Background

The Petitioner was named in six counts of a 66-count Superseding Indictment charging

multiple violent crimes in aid of racketeering, firearms offenses, and a drug conspiracy. (Docket

No. 245 in Case No. 3:09-00244).  The charges primarily arose out of five separate, gang-related

shootings, in which four victims were injured and two victims were killed. (Id.)  The Petitioner's

charges primarily related to the murder of Brandon Harris, and the assault of Maurice Boyd. (Id.)

 Eight other individuals were named as Co-Defendants, five of whom entered plea agreements

prior to trial, and two of whom, Roger Wayne Battle and Gary Eugene Chapman, proceeded to

trial with the Petitioner.

After a week-long trial, the Petitioner was convicted of all six charges. (Docket No. 739

in Case No. 3:09-00244). At the subsequent sentencing hearing, the Court sentenced the Petitioner to two consecutive life terms. (Docket Nos. 847, 848 in Case No. 3:09-00244). The Petitioner appealed, and the Sixth Circuit affirmed the Petitioner's convictions and sentence. (Docket No. 951 in Case No. 3:09-00244).

The Presentence Investigation Report describes the evidence adduced at trial, in pertinent part, as follows:

13.    The Almighty Vice Lord Nation, commonly referred to as the Vice Lords, is a national gang founded in Chicago, Illinois. There are 28 'sets' within the Vice Lords. Some of the sets are the Traveling Vice Lords, and the Mafia Insane Vice Lords. The Vice Lords 'bless in' members through oaths. They have meetings, pay dues, and have a chain of command. Members hold various ranks within the Vice Lords. The Vice Lords have male and female members. Female members are referred as 'Flowers.'

14.    From 2007 to 2009, Roger Wayne Battle, Jessie Lobbins, Gary Eugene Chapman, Christopher David Imes, Demarco Lewayne Smith, Lashaundra Danielle Hightower, Curtis S. Green, Samuel Joseph Gaines, and Delregus Alexander were members and associates of the Vice Lords, a criminal organization and enterprise whose members and associates engaged in narcotics distribution and acts of violence including acts involving kidnaping, attempted murder, assault, murder, and conspiracy to commit the foregoing acts which operated in Davidson County, Tennessee, and Rutherford County, Tennessee.

* * *

18.    Jessie Lobbins was a member of the Traveling Vice Lords and held a rank lower than Roger Wayne Battle.

* * *

26.    On or about February 10, 2008, Brandon Harris was murdered at approximately 10:48 p.m. on Rice Road near Rural Hill Road in Antioch, Tennessee, by Roger Wayne Battle and Jessie Lobbins. Sometime prior to February 10, 2008, Harris called Fred Carney and told Carney that he thought Battle may have had something to do with the murder of Donnell Valentine, who as (sic) shot and killed outside of a nightclub in Murfreesboro, Tennessee, on November 10, 2007. Harris told Carney to be careful. Carney then called Battle and told him what Harris said. Battle was not happy about Harris making this statement.

Furthermore, Harris had made statements that Carney did not deserve the rank he held in the Vice Lords.

27.     On February 10, 2008, Battle called Samuel Gaines while Gaines was at his parents' house. Battle told Gaines that they were 'going to take care of this tonight.' Gaines knew from this statement that Battle intended to kill Harris. Battle told Gaines to call Harris and tell Harris that Gaines was on his way to pick Harris up. Battle explained that he had already called Harris and that Harris was expecting to participate in a drug transaction. Battle told Gaines to meet him at the O'Charley's restaurant located at Hickory Hollow Mall in Antioch, Tennessee. Gaines had been present when a previous drug deal occurred between Battle and Harris at this location and was aware that Battle and Harris conducted drug transactions together. Gaines stated that Battle would supply drugs to Harris and that Harris would give the money to Battle. Gaines had transported drug money between Harris and Battle in the past.

28.     Gaines called Harris and told him that Battle had instructed him to pick Harris up. Harris then called Dwjuan Miller and told Miller that if anything were to happen to him that he was going to be with Gaines and Battle. Harris provided Miller with Gaines' and Battle's phone numbers, and Harris told Miller, 'They aren't authentic.' Miller understood this to mean that Harris thought Gaines and Battle were not trustworthy.

29.     Gaines picked Harris up in his vehicle. After picking Harris up, Gaines called Battle to let him know they were on their way to meet him. During the drive, Gaines and Harris discussed several topics. Harris asked Gaines where he was going to hide the drugs in the car, and Gaines showed Harris a place in the console. Harris talked about a January 1, 2008, shooting on Castleview Street in Murfreesboro, Tennessee. Harris stated that Battle had made a mistake with the shooting and should have waited for things to die down.

30.     Delregus Alexander was with Battle and Jessie Lobbins at Battle's residence in Nashville, Tennessee. At one point, Battle and Lobbins began to leave the residence. Alexander had heard Battle discussing a drug deal over the phone. Alexander was told by Battle that Battle and Lobbins were going to meet Harris for a drug deal at O'Charley's. As Battle and Lobbins left the residence, Alexander went along to get out of the house.

31.     Battle, Lobbins, and Alexander left in a full size extended cab pickup truck. Battle drove, Lobbins was in the passenger seat, and Alexander was in the back seat. Alexander heard Battle call Harris and talk to him about participating in a drug transaction. This did not surprise Alexander, as Alexander was aware that Battle had supplied cocaine to Harris for resale on prior occasions.

32.     Battle, Lobbins, and Alexander drove to O'Charley's, which is where Battle had delivered drugs to Harris on several occasions. While waiting at the O'Charley's parking lot for Harris to arrive, Alexander learned from the conversation between Battle and Lobbins that Battle and Lobbins were going to kill Harris and that there was to be no drug deal. This did not bother Alexander, and he made no mention of not wanting to ride along as he would have lost status with Battle and Lobbins and would have been considered a punk or a snitch. Alexander, when subsequently interviewed by law enforcement, stated he did not have a gun and was not going to participate in the murder on that basis.

33.     When Gaines arrived at the O'Charley's parking lot, Gaines called Battle. Battle told Gaines not to park in the lot as there were too many cars there, and he instructed him to move to the next parking lot. After moving to this parking lot, Battle called Gaines and told Gaines to act like he was talking to someone else. Battle then started asking questions about Harris. Battle called Gaines again and told Gaines to follow him.

34.     Battle then drove to a street in Antioch with Gaines following. When Battle pulled to the side of the road, Gaines parked behind him. After stopping the truck, Battle got out. Alexander observed Battle walk towards the rear of the truck. Alexander then slid down in the seat, as he did not know if Harris had a gun or not, and Alexander did not have one. Alexander stated that Lobbins also got out of the truck. Alexander heard Battle begin shooting. Alexander then heard other shots, in addition to Battle's, being fired. Alexander heard someone state 'make sure he's gone,' but he did not know who made that statement.

35.     Alexander observed Battle and Lobbins run back to the truck, and Battle drove to his residence in Nashville. During the drive, Alexander heard Battle and Lobbins discuss the shooting. Alexander heard Battle state that he used the spark from the muzzle of the gun to see where Harris was as he was shooting at him. Lobbins stated he thought Harris had a gun and that was when he (Lobbins) fired his weapon.

36.     According to Gaines, as it relates to Harris' shooting, he followed Battle to a location with which Gaines was not familiar. The location was very dark. Gaines stated Harris got out of the car and started to approach the driver's side of the pickup. Gaines observed Battle exit the pickup. Gaines could see a gun in Battle's hand. Gaines saw Harris approach Battle and began to move his hand up as if to shake Battle's hand. Battle then shot Harris. Harris ran back to Gaines's vehicle, and bounced off the passenger side of the car. At this time, Gaines observed Lobbins begin shooting Harris, and Harris then ran down the street. Gaines observed Battle and

Lobbins run after Harris shooting their weapons. Gaines stopped watching and did not see Harris fall to the ground. Gaines saw Battle and Lobbins run back to the truck, get in, and drive off. Gaines did not observe any other person in the truck.

37. After the shooting, Gaines followed Battle back to the interstate. Once on the interstate Gaines was separated from Battle. Gaines knew he was to meet with Battle at Battle's residence. While driving, Lobbins called Gaines from Battle's phone. Lobbins told Gaines to 'keep it 100,' which Gaines understood to mean to 'keep it true' or 'keep it 100%.'

38. At Battle's residence, Gaines heard Battle and Lobbins discuss the shooting. He heard them talk about Harris falling to the ground and a discussion about how they should have shot Harris in the head while he was on the ground. Gaines told Battle and Lobbins they should have taken the phone from Harris and the pictures that were in the phone. Battle instructed Gaines to call Harris' phone. When Gaines did so, an officer answered. Gaines told the officer he was a friend of Harris' and was looking for him. The officer told Gaines that Harris had gotten in some trouble but would not say more.

39. Dwjuan Miller became concerned about Harris, as he did not receive a call from Harris regarding the drug deal being completed. Miller then called Gaines and asked if Gaines knew where Harris was. Gaines told Miller that he (Gaines) was in bed and had dropped Harris off and that Gaines had school the next day. Miller then called Battle's phone and someone answered the phone. Miller asked for Battle and was told no one by that name lived there. Miller then received a call from Battle. Miller recognized Battle's voice on the phone from previous conversations with Battle. Battle told Miller not to call him at home and not to call there. Miller then called Harris' phone. A person identifying himself as a detective answered the phone and told Miller that Harris was dead.

40. Michael Aile learned that Harris had been killed. Aile called Battle and asked Battle if Battle had killed Harris. Battle responded, 'Yep.' One week later, Aile and Battle engaged in a transaction for one pound of marijuana. This drug deal occurred near Toot's restaurant in Murfreesboro. Aile was purchasing from Battle. Lobbins was also present during the drug transaction. During the drug deal, Battle and Lobbins discussed how they shot Harris. Lobbins stated that Battle 'called a head shot,' and Battle stated that Harris started running and they 'ate him up.' Lobbins also physically acted out some of the shooting, demonstrating how he held his gun.

5

41.     Battle and Lobbins were charged by state authorities with the first degree murder of Brandon Harris, but the charge was nolle prossed on December 17, 2009 (Case No. 2008-C-2251, Davidson County Criminal Court, Nashville, Tennessee).

Arrest of Jessie Lobbins

42.     On March 4, 2008, Nashville Metropolitan Gang Unit detectives were conducting surveillance at Battle's residence. Battle had an outstanding probation violation warrant. Officers observed Battle, Lobbins, and Delregus Alexander exit Battle's residence and get in a GMC Yukon which was registered to Battle. Battle was the driver of the vehicle. Officers stopped the vehicle on Dickerson Pike in Nashville, Tennessee, and arrested Battle. Lobbins was in the front passenger seat, and Alexander was in the back seat on the passenger side. A SWD (Cobray), model M11/9, 9mm semiautomatic pistol was under the front passenger seat. The pistol had one round in the chamber and 25 rounds in the magazine. Further investigation revealed the weapon had been stolen from Morristown, Tennessee, sometime between 1994 and 1995.

43.     Alexander stated that Lobbins was carrying the gun on the day they were stopped. Based on Ballistics Analysis, the SWD (Cobray), model M11/9, 9mm pistol was determined to have been used at the shooting at 431 East State Street in Murfreesboro, Tennessee, on November 13, 2007.[1]

> [1] Lobbins was not involved in the shooting at 431 East State Street on November 13, 2007. He was in the custody of the Tennessee Department of Correction (TDOC) for felony offenses committed in 2001. He was released from TDOC custody on January 25, 2008.

44.     Battle and Lobbins were each charged by state authorities with felon in possession of a firearm and possession of stolen property, but the charges were nolle prossed on December 17, 2009 (Case No. 2008-B-1966, Davidson County Criminal Court, Nashville, Tennessee).

45.     Prior to March 4, 2008, Lobbins was a convicted felon. Specifically, he had been convicted of (1) Kidnapping, Shelby County Criminal Court, Memphis, Tennessee, Case No. 02-05336 (sentence date: January 22, 2003), and (2) Aggravated Robbery, Shelby County Criminal Court, Memphis, Tennessee, Case No. 02-05337 (sentence date: January 22, 2003).

Jessie Lobbins' Assault and Tampering With a Witness

46.     On November 21, 2009, Lobbins, who had already been indicted by federal authorities in the instant case, was housed at the Davidson County Criminal Justice Center in Nashville, Tennessee. Before November 21, 2009, another inmate at the Criminal Justice Center, Maurice Boyd, had provided information to federal authorities regarding a homicide involving Lobbins' fellow gang members.

47.     On the morning of November 21, 2009, two other inmates approached Maurice Boyd while he was sleeping. They held him down and hit him. Jessie Lobbins, who had a knife, cut Boyd on the face (12-centimeter laceration), back (10-centimeter laceration), and three times on the left forearm (one laceration measured eight centimeters and two lacerations measured four centimeters each). All of the lacerations were dermal-layer injuries except the eight-centimeter forearm laceration, which was described by medical personnel as a 'depth to muscle' injury. Boyd, who survived the attack, was treated at Vanderbilt University Medical Center in Nashville, Tennessee, where he received more than 200 stitches.

48.     Shortly after the incident, jail authorities seized Lobbins' jail uniform, which had blood on it. The jail uniforms of the other assailants also had blood on them. The shoes which Lobbins and the other assailants wore were found to have blood on them. The knife was not recovered. . . [1]

49.     Lobbins and the two other assailants were charged by state authorities with attempted first degree murder and conspiracy to commit first degree murder. However, the charges against Lobbins and the two other individuals were nolle prossed on July 21, 2010 (Case No. 2010-A-159, Davidson County Criminal Court, Nashville, Tennessee).

        Case No. 3:12-00023-01

50.     As noted previously, on August 23, 2011, a jury found Jessie Lobbins guilty in Case No. 3:09-00244-02. During the course of the trial, and while Lobbins was pending sentencing on Case No. 3:09-00244-02, he was housed at the Robertson County Jail in Springfield, Tennessee.

51.     At approximately 2:00 a.m. on November 30, 2011, Jessie Lobbins and another inmate, Joshua Caldwell, escaped from the Robertson County Jail through air ducts in the facility.

---

[1]   At the sentencing hearing, the parties agreed that there was a typographical error in the fourth sentence of Paragraph 48. (Docket No. 854, at 3-4, in Case No. 3:09-00244). The Court has omitted that sentence here.

52.     Lobbins and the other inmate stole a pickup truck in Springfield, Tennessee, and traveled to Texas. Subsequent investigation by the U.S. Marshals Service revealed that Lobbins and Caldwell were residing at a residence in Denton, Texas. On the evening of December 2, 2011, U.S. Marshals entered the residence. Lobbins, who was inside a locked bedroom, was arrested without incident. Caldwell, who was hiding in a closet, was arrested after a brief struggle. No law enforcement officers were injured during the arrest of Lobbins and Caldwell.

(Docket No. 881 in Case No. 3:09-00244).

## III. Analysis

### A.  The Petitioner's Claims

Petitioner contends that his convictions should be vacated because he received the ineffective assistance of counsel.

### B. The Section 2255 Remedy

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to have their sentence vacated, set aside or corrected.[2] The statute does not provide a remedy, however, for every error that may have been made in the proceedings leading to conviction. "'To warrant relief under section 2255, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty

---

[2] 28 U.S.C. § 2255 states, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

plea or the jury's verdict.'" Humphress v. United States, 398 F.3d 855, 858 (6th Cir.

2005)(quoting Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003)).

An evidentiary hearing is not required if the record conclusively shows that the Petitioner

is not entitled to relief. 28 U.S.C. § 2255(b); Ray v. United States, 721 F.3d 758, 761 (6th Cir.

2013); Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). No hearing is required "if

the petitioner's allegations 'cannot be accepted as true because they are contradicted by the

record, inherently incredible, or conclusions rather than statements of fact.'" Id.  Where the same

judge considering the Section 2255 motion also presided over the underlying criminal

proceedings, the judge may rely on his own recollection of those proceedings. Blackledge v.

Allison, 431 U.S. 63, 97 S.Ct. 1621, 1629 n.4, 52 L.Ed.2d 136 (1977); Ray, 721 F.3d at 761.

The Court has reviewed the pleadings, briefs, transcripts, and records filed in Petitioner's

underlying criminal case, as well as the pleadings, briefs, and records filed by the parties in this

case. The Court finds it unnecessary to hold an evidentiary hearing because these records

conclusively establish that Petitioner is not entitled to relief on the issues raised.

C.  Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, the burden is on the

Petitioner to show: (1) counsel's performance fell below an objective standard of reasonableness;

and (2) actual prejudice resulted from the deficient performance. Strickland v. Washington, 466

U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Cullen v. Pinholster, 131 S.Ct. 1388,

1403 (2011); Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the trial cannot be

relied upon as having produced a just result." <u>Strickland</u>, 104 S.Ct. at 2052; <u>Ludwig v. United States</u>, 162 F.3d 456, 458 (6th Cir. 1998).  In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 104 S.Ct. at 2065.

In order to establish prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u>, at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 2052. The likelihood of a different result "must be substantial, not just conceivable." <u>Harrington v. Richter</u>, 562 U.S. 86, 112, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011).

1. <u>Failure to Attack Count 62 on Grounds of Duplicity and Non-Jury Unanimity</u>

Petitioner argues that counsel should have challenged Count 62 as duplicitous because it combined two separate offenses in one count. Count 62 provides as follows:

COUNT SIXTY-TWO
(Possession of A Firearm/Ammunition By A Convicted Felon
Roger Wayne Battle a/k/a 'T-Wayne' Jessie Lobbins a/k/a 'Jessie Oliver' a/k/a 'Trap')

The Grand Jury Further Charges:

174.    On or about March 4, 2008, in the Middle District of Tennessee, ROGER WAYNE BATTLE a/k/a 'T-WAYNE' and JESSIE LOBBINS a/k/a 'JESSIE OLIVER' a/k/a 'TRAP', being aided and abetted each by the other, and being a person(s) who had previously been convicted in any court of a crime punishable by a term of imprisonment exceeding one year, did unlawfully and knowingly possess, in or affecting commerce, a firearm, to wit a SWD (Cobray) model M11/9 and did unlawfully and knowingly possess, in or affecting commerce, ammunition, to wit 9 millimeter ammunition.

In violation of Title 18, United States Code, Sections 922(g)(1), 924(a)(2) and 2.

(Docket No. 245 in Case No. 3:09-00244).

By charging possession of both a firearm and ammunition in Count 62, Petitioner argues, the Indictment is duplicitous in that it impermissibly charges two separate crimes in one count. The Sixth Circuit has explained that an indictment is duplicitous if it "'joins in a single count two or more distinct and separate offenses.'" <u>United States v. Campbell</u>, 279 F.3d 392, 398 (6th Cir. 2002)(quoting <u>Uited States v. Shumpert Hood</u>, 210 F.3d 660, 662 (6th Cir. 2000)). The concern with a duplicitous count is that "a 'jury may find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense.'" <u>Id.</u> Charging multiple offenses in a single count "'prevent[s] the jury from convicting on one offense and acquitting on another.'" <u>Id.</u>

Had counsel raised a challenge to Count 62 based on duplicity, however, it would not have been successful. Any concern about duplicity was remedied by the Court's instruction to the jury regarding unanimity as to Count 62: "I also instruct you that in order to find a defendant guilty of this charge, you must unanimously agree on the firearm and/or ammunition possessed by the defendant." (Docket No. 866, at 73, in Case No. 3:09-00244). <u>See</u> <u>United States v. Davis</u>, 306 F.3d 398, 415-16 (6th Cir. 2002)(Any duplicity problem cured by clarification in jury instructions).

In addition, Count 62 was based on the stop of the car in which the Petitioner was riding on March 4, 2008, and the seizure of a firearm and ammunition from that car. The Sixth Circuit has held that the simultaneous possession of multiple firearms, or of a firearm and ammunition, can support only one conviction of Section 922(g)(1). <u>See</u>, <u>e.g.</u>, <u>United States v. Adams</u>, 214 F.3d 724, 728-29 (6th Cir. 2000). Thus, separate counts for the firearm and ammunition would

not have been appropriate.[3]

For these reasons, any challenge by trial counsel based on duplicity would have been unsuccessful, and the Petitioner was not prejudiced by any failure in that regard. See, e.g., Ludwig v. United States, 162 F.3d at 458 (Counsel is not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel).

2. Failure to Attack Count 60 on the Ground That it Charges a Non-Existent Offense Under 18 U.S.C. § 924(c)

Petitioner argues that trial counsel should have challenged his Judgment in the underlying criminal case because, as to Count 60, it described a "non-existent" offense, and constitutes an amendment of the Indictment. The first page of the Judgment indicates that the Petitioner was found guilty of Counts 58, 59, 60, 62, 65 and 66. (Docket No. 847, at 1, in Case No. 3:09-00244). On that same page, each count is described by "Title & Section," "Nature of Offense," "Offense Ended," and "Count." (Id.) For Count 60, the Judgment indicates that it charged a violation of "18 U.S.C. §§ 924(c) and (j)" and describes the "Nature of Offense" as "Use and Carry of Firearm During a Crime of Violence Causing Death by Murder." (Id.) According to the Petitioner, his conviction on Count 60 is invalid because the description of the offense did not include the phrase "and in relation to" after the word "during." Had trial counsel challenged the omission of this phrase, however, the challenge would have been meritless.

Count 60 of the Superseding Indictment charged that the Petitioner and Co-Defendant Battle "did knowingly use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is conspiracy to commit murder

---

[3]   The Petitioner received one sentence for possession of both the firearm and ammunition in Count 62. (Docket No. 847 in Case No. 3:09-00244).

against Brandon Harris a/k/a 'Chicago'. . .in violation of Title 18, United States Code, Sections 924(c)(1)(A), 924(j) and 2." (Docket No. 245 in Case No. 3:09-00244). The Court read Count 60, in its entirety, to the jury as part of the instructions prior to deliberations. (Docket No. 866, at 1777-78, in Case No. 3:09-00244). In instructing the jury as to the elements required to find the Defendant guilty of Count 60, the Court described the third element as requiring a finding that: "[t]he use or carrying of the firearm was during and in relation to the crime of violence, as charged in Count 60." (Id., at 1833-34). The Court also specifically defined the phrase "during and in relation to." (Id., at 1806, 1834). In finding the Petitioner guilty of Count 60, the jury checked "guilty" after the following statement on the Verdict Form: "With respect to the charge in Count Sixty of the Indictment of murder of Brandon Harris resulting from using or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j), we find the Defendant, JESSIE LOBBINS:" (Docket No. 739 in Case No. 3:09-00244).

The Petitioner's conviction of Count 60 was valid, and the shorthand reference to the name of the offense on the Judgment form in no way affected the validity of that conviction. Therefore, any challenge by trial counsel to that conviction on that basis would have been unsuccessful, and the Petitioner was not prejudiced by any failure in that regard. See, e.g., Ludwig v. United States, 162 F.3d at 458.

   3.   Failure to Attack Count 66 For Omission of an Essential Element of the
        Offense, Duplicity and That the Conduct was Rendered Non-Criminal by the
        Supreme Court Prior to Trial

Petitioner argues that trial counsel should have challenged Count 66 of the Superseding Indictment on various grounds. Count 66 provides as follows:

13

COUNT SIXTY-SIX
(Tampering with a Witness, Victim, or Informant Maurice Boyd)

The Grand Jury Further charges:

179.   On or about November 21, 2009, in the Middle District of Tennessee, the defendant, JESSIE LOBBINS a/k/a 'JESSIE OLIVER' a/k/a 'TRAP', used physical force, attempted to use physical force, and threatened to use physical force against Maurice Boyd by cutting him numerous times with a dangerous weapon, with the intent to influence, delay, and prevent the testimony of Maurice Boyd in an official proceeding, and with the intent to hinder, delay, and prevent the communication of Maurice Boyd to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense pending judicial proceedings.

In violation of Title 18, United States Code, Sections 1512(a)(2)(A) and (C), and 2.

(Docket No. 245 in Case No. 3:09-00244).

Sections 1512(a)(2)(A) and 1512(a)(2)(C) provide as follows:

(2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to –

> (A) influence, delay, or prevent the testimony of any person in an official proceeding;
>
> * * *
>
> (C) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

The term "official proceeding" includes a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, or a federal grand jury. 18 U.S.C. § 1515(a)(1).  Section 1512(f)(1) provides that "an official proceeding need not be pending or about to be instituted at the time of the offense. . . "

Petitioner argues that counsel was ineffective for failing to challenge the indictment's omission of an essential element of the offense – identification of the official proceeding he attempted to obstruct. According to the Petitioner, the Indictment's failure to provide this information deprived him of his Sixth Amendment right to be provided notice of the charges against him.

An indictment is constitutionally sufficient if it sets forth the essential elements of the offense charged and fairly informs the defendant of the charge against which he must defend; and protects the defendant against double jeopardy. United States v. Resendiz-Ponce, 549 U.S. 102, 127 S.Ct. 782, 788, 166 L.Ed.2d 591 (2007). The general rule is that an indictment is sufficient if its language tracks the statute. See, e.g., United States v. Horton, 580 Fed. Appx. 380, 383 (6th Cir. Sept. 16, 2014).

Petitioner relies on the First Circuit Court of Appeals' decision in United States v. Murphy, 762 F.2d 1151 (1st Cir. 1985) to support his argument that the indictment was defective. In Murphy, the court held that an indictment alleging a violation of Section 1512(a)(1) did not adequately inform the defendants of the charges against them because the "official proceeding" was not identified in the indictment. The victim in Murphy was a drug informant in several ongoing investigations, and the court concluded that the defendants could not determine from the indictment which proceeding they were allegedly attempting to influence: "It is wholly unclear from the indictment whether the grand jury was charging that defendants tried to influence [the victim's] testimony in the proceeding against Dawlett, or in the proceeding against them, or in some other proceeding altogether." 762 F.2d at 1154.

Courts in subsequent cases have distinguished Murphy on that basis, and have held that

even though the jury must find there was a foreseeable official proceeding at the time of the alleged obstructive conduct, the "official proceeding," or the relationship ("nexus") between the obstructive act and the official proceeding, need not be alleged in the indictment.[4] See United States v. Moyer, 726 F.Supp.2d 498, 510-11 (M. D. Penn. 2010); United States v. Boyd, 309 F.Supp.2d 908, 915-16 (S.D. Tex. 2004). See also United States v. Brimager, 2014 WL 1515867 (S.D. Cal. Apr. 17, 2014); United States v. Ring, 628 F.Supp.2d 195, 223-25 (D.D.C. 2009).

Based on this authority, the Court is persuaded that the indictment was constitutionally sufficient though it lacked identification of the "official proceeding." Therefore, any challenge by trial counsel to the indictment on that basis would not have been successful, and the Petitioner was not prejudiced by any failure in that regard. See, e.g., Ludwig v. United States, 162 F.3d at 458.[5]

Petitioner also argues that counsel should have challenged Count 66 on duplicity grounds because it charges two offenses – a violation of 18 U.S.C. § 1512(a)(2)(A) and a violation of 18 U.S.C. § 1512(a)(2)(C) – in a single count. Petitioner has again failed to demonstrate prejudice, however, because a challenge to Count 66 based on duplicity would not have been successful as

---

[4]   As discussed below, the "nexus" language is based on the Supreme Court's holding in Arthur Anderson LLP v. United States, 544 U.S. 696, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005) that a conviction under Sections 1512((b)(2)(A) and (B) requires the government to prove a nexus between the allegedly obstructive act and a particular proceeding.

[5]   The Court also notes that, in any event, trial counsel was not deficient for failing to recognize the issue. The record reveals that in the early stages of the criminal proceeding, trial counsel filed a Motion For Bill Of Particulars (Docket No. 367 in Case No. 3:09-00244) requesting information about various allegations in the Superseding Indictment, including: "The 'official proceeding' which Jessie Lobbins intended to 'influence, delay, and prevent the testimony Maurice Boyd.'" The Court subsequently denied the Motion. (Docket No. 504 in Case No. 3:09-00244).

any concern regarding duplicity was remedied by the Court's instructions to the jury. After stating the elements of a violation of 18 U.S.C. § 1512(a)(2)(A) and the elements of a violation of 18 U.S.C. § 1512(a)(2)(C), the Court instructed the jury as follows: "I instruct you that you must unanimously agree on whether the defendant committed a violation of Title 18 United States Code, Section 1859(a)(2)(A),[6] or a violation of Title 18, United States Code, 1512(a)(2)(C), or both, in order for you to return a guilty verdict on Count 66." (Docket No. 866, at 93, in Case No. 3:09-00244). See United States v. Davis, 306 F.3d at 415-16 (Any duplicity problem cured by clarification in jury instructions).

Petitioner argues that the unanimity instruction was ineffective because the verdict form did not require separate findings on the two offenses charged. It is well established, however, that juries are presumed to follow the instructions of the Court, see, e.g., Davis, 306 F.3d at 416, and the Court clearly explained the unanimity requirement. In addition, the courts have long held that special interrogatories or verdicts are not favored in criminal cases, and Petitioner has not cited any applicable authority requiring their use in his case. See, e.g., United States v. Blackwell, 459 F.3d 739, 766-67 (6th Cir. 2006); United States v. Schmidlin, 441 Fed. Appx. 338, 342 (6th Cir. Sept. 28, 2011). Thus, any request by trial counsel for the use of a special interrogatory would not have been granted, and the Petitioner was not prejudiced by any failure

_____

[6] Although the trial transcript reflects that the Court stated "1859" instead of "1512" in reading this sentence, the Court assumes this is a typographical error as 18 U.S.C. § 1859 relates to the interruption of public land surveys. In any event, every other reference to Count 66 in the jury charge, the verdict form, and the Superseding Indictment, which the Court read to the jury, accurately identified Section 1512 as the relevant statute section. A copy of the jury charge, verdict form, and Superseding Indictment was provided to each juror.

in that regard.[7]

Petitioner also argues that trial counsel should have challenged the failure of the jury instructions to require a nexus between the obstructive act and a particular federal proceeding, citing Arthur Anderson LLP v. United States, 544 U.S. 696, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005). In Arthur Anderson, the Supreme Court held that a defendant cannot be convicted under Sections 1512(b)(2)(A) and (B) unless the government shows that the defendant contemplated a "a particular official proceeding" when undertaking the obstructive act. 125 S.Ct. at 2137.

The 2000 versions of Sections 1512(b)(2)(A) and (B), which were at issue in Arthur Anderson, provided as follows:

> (b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
>
> * * *
>
> (2) cause or induce any person to--
>
>> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>>
>> (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

---

[7] Petitioner also complains that the Judgment (Docket No. 847 in Case No. 3:09-00244) lists Count 66 as a violation of Section 1512(a)(2)(A), and does not mention a violation of Section 1512(a)(2)(C). The Petitioner fails to identify any prejudice that he suffered as a result of the failure to mention all applicable statutes in the Judgment. The Court notes that, as described in Paragraph 64 of the Presentence Investigation Report (Docket No. 881 in Case No. 3:09-00244), Petitioner's convictions of Counts 65 and 66, relating to Maurice Boyd, were grouped together for the purposes of sentencing, and Petitioner's sentence on each of those counts was ordered to run concurrent with his two life sentences. (Docket No. 847 in Case No. 3:09-00244).

* * *

shall be fined under this title or imprisoned not more than ten years, or both.

In reaching its decision, the <u>Arthur Anderson</u> Court first determined that the trial court erred when it instructed the jury that the word "corruptly" covered innocent conduct, and that "even if [petitioner] honestly and sincerely believed that its conduct was lawful, you may find [petitioner] guilty." 125 S.Ct. at 2136. The Court also determined that the trial court erred in leading the jury to believe that "it did not have to find *any* nexus between the 'persua[sion]' to destroy documents and any particular proceeding." <u>Id.</u>  Although the statute provides that an official proceeding need not be pending at the time of the offense, the Court explained, a person cannot "knowingly corruptly persuade" by persuading others "to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material." <u>Id.</u>, at 2137.

Assuming the <u>Arthur Anderson</u> decision construing Sections 1512(b)(2)(A) and (B) applies to the interpretation of Section 1512(a)(2)(A), under which the Petitioner was charged,[8] there would have been no basis for challenge because the jury instructions given at Petitioner's trial do not suffer the same infirmities as the instructions at issue in <u>Arthur Anderson</u>. In charging the jury at Petitioner's trial, the Court listed the elements of a violation of Section 1512(a)(2)(A) as follows:

> 1.  On or about the time period described in Count 66, the defendant knowingly used or attempted to use physical force or the threat of physical force

---

[8]  The <u>Arthur Anderson</u> "nexus requirement" does not apply to the Petitioner's charge under Section 1512(a)(2)(C) because that subsection relates to investigations, and does not contain the "official proceeding" language. <u>See</u>, <u>e.g.</u>, <u>United States v. Carson</u>, 560 F.3d 566, 580-82 (6th Cir. 2009).

against Maurice Boyd;

   2.  The defendant *acted with intent to influence, delay, or prevent the testimony of Maurice Boyd in an official proceeding*;

   3.  The defendant knew or should have known *that the official proceeding was pending or was likely to be instituted*, although the government need not prove that an official proceeding was actually pending or about to be instituted at the time of the alleged offense; and

   4.  The official proceeding was a federal proceeding, although the government does not need to prove that the defendant knew that the proceeding was a federal proceeding.

(Docket No. 866, at 1845, in Case No. 3:09-00244)(emphasis added). The Court adequately instructed the jury as to the "nexus requirement," and any challenge by trial counsel on that basis would have been unsuccessful.  Accordingly, Petitioner was not prejudiced by any failure in that regard.

   The Petitioner also argues that counsel should have challenged the failure of the jury instructions to require the jury to find, with regard to the Section 1512(a)(2)(C) offense, a "reasonable likelihood" that the victim would communicate with federal law enforcement officers. Because there is no proof on that issue, Petitioner argues, he is "actually innocent" of the offense.

   To support his argument, Petitioner relies on the Supreme Court's decision in <u>Fowler v. United States</u>, 563 U.S. 668, 131 S.Ct. 2045, 179 L.Ed.2d 1099 (2011), decided three months before the Petitioner's trial.  In <u>Fowler</u>, the defendant was convicted of violating 18 U.S.C. § 1512(a)(1)(C), which provides:

  (a)(1) Whoever kills or attempts to kill another person, with intent to--

* * *

    (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal

20

offense or a violation of conditions of probation, parole, or release
pending judicial proceedings;

shall be punished as provided in paragraph (3).

The Fowler Court addressed the question of how Section 1512(a)(1)(C) applies when a defendant kills a victim with the intent to prevent a communication to law enforcement officers in general rather than to some specific law enforcement officer or set of officers. 131 S.Ct. at 2049. To establish a violation, the Court concluded, the government was required to prove a "reasonable likelihood" that at least one relevant communication would have been made by the victim to a federal law enforcement officer. 131 S.Ct. at 2052.

Assuming trial counsel was deficient for failing to request a jury instruction based on this three-month old holding, the Court concludes that the Petitioner is unable to establish that he was prejudiced as a result given the evidence of his guilt. See, e.g., Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2265, 176 L.Ed.2d 1098 (2010)(Petitioner unable to establish prejudice as a result of counsel's failure to request instruction because the "record establishes that it was not reasonably likely that the instruction would have made any difference in light of all the other evidence of guilt."); Wade v. Timmerman-Cooper, 785 F.3d 1059, 1079-80 (6th Cir. 2015).

At Petitioner's trial, the victim, Maurice Boyd, testified that he was assaulted by the Petitioner and others while in federal custody awaiting sentencing on a federal charge of being a convicted felon in possession of a firearm. (Docket No. 863, at 1398-99, 1406, 1412-13 in Case No. 3:09-00244). Mr. Boyd had been providing information to local law enforcement officers and the ATF regarding the Petitioner's fellow Vice Lord gang members and their involvement in the murder of a Vanderbilt University professor. (Id., at 1402-04, 1407-09). The Government

argued that this information would have been disclosed by Mr. Boyd in connection with his

federal sentencing to demonstrate his cooperation with law enforcement authorities in an effort

to obtain a reduced sentence. (Docket No. 865, at 1613, 1687, in Case No. 3:09-00244). The

Court is persuaded that the evidence supports a reasonable likelihood that, at the time the

Petitioner assaulted Mr. Boyd, at least one relevant communication would have been made by

Mr. Boyd to a federal law enforcement officer.  Thus, the Petitioner has not shown prejudice, nor

has he shown that he is "actually innocent" of Count 66, based on the decision in  Fowler.

    4. Failure to Attack Count 65 on Grounds of Duplicity and Constructive Amendment

Petitioner argues that trial counsel was ineffective for failing to challenge Count 65 of the

Superseding Indictment on various grounds.  Count 65 provides as follows:

COUNT SIXTY-FIVE
(Assault With a Dangerous Weapon and Assault
Resulting in Serious Bodily Injury of Maurice Boyd)

The Grand Jury Further Charges:

177.    The allegations of Paragraphs 1-14 are hereby re-alleged and incorporated as if fully set forth herein.

178.    On or about November 21, 2009, in the Middle District of Tennessee, for the purpose of maintaining and increasing position in the Vice Lords, an enterprise engaged in racketeering activity, the defendant, JESSIE LOBBINS a/k/a 'JESSIE OLIVER' a/k/a 'TRAP', did unlawfully, knowingly and intentionally commit an assault with a dangerous weapon against Maurice Boyd, and an assault resulting in serious bodily injury of Maurice Boyd, in violation of the laws of the State of Tennessee, that is Tennessee Code Annotated Sections 39-13-101, 39-13-102(a)(1), 39-11-401, and 39-11-402.

All in violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

(Docket No. 245 in Case No. 3:09-00244).

Section 1959 prohibits violence in aid of racketeering ("VICAR"), as follows:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished--

> (1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

> (2) for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

> (3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

> (4) for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

> (5) for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

> (6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine under this title, or both.

(b) As used in this section--

> (1) "racketeering activity" has the meaning set forth in section 1961 of this title; and

> (2) "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.

The Petitioner contends that counsel was ineffective for failing to argue that Count 65

was duplicitous because it alleged two crimes – assault with a dangerous weapon and assault resulting in serious bodily injury– in aid of racketeering. Petitioner argues that the Court should have instructed the jury that they were required to unanimously agree on which type of assault the Petitioner committed, and should have required the jury to answer a special interrogatory to reflect its findings.

To support his argument, the Defendant relies on Richardson v. United States, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). In Richardson, the defendant appealed his conviction of 21 U.S.C. § 848, which prohibits engaging in a "continuing criminal enterprise." A continuing criminal enterprise is defined in the statute as involving a continuing series of narcotics violations. To satisfy the "series of violations" requirement, the trial court instructed the jury that they were to unanimously agree that the defendant committed at least three federal narcotics offenses, but did not have to agree as to the particular three or more offenses the defendant had committed. 526 U.S. at 815-16. The Supreme Court reversed the conviction, holding that the jury was required to unanimously agree as to each individual violation. Id.

In reaching its decision, the Court distinguished between the "elements" of a crime – which must be determined unanimously – and the "means" by which an element may be accomplished – which do not require unanimous agreement:

> The question before us arises because a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime. Schad v. Arizona, 501 U.S. 624, 631â€'632, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion); Andersen v. United States, 170 U.S. 481, 499-501, 18 S.Ct. 689, 42 L.Ed. 1116 (1898). Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement – a disagreement about means – would not matter as long as all 12 jurors unanimously concluded that the

Government had proved the necessary related element, namely, that the defendant had threatened force. See McKoy v. North Carolina, 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring).

526 U.S. at 817-18.

In a subsequent case involving the aiding and abetting statute, 18 U.S.C. § 2,[9] the Sixth

Circuit distinguished Richardson by noting the unusual breadth of the CCE statute:

> One of the driving forces behind the Supreme Court's decision was the breadth of the CCE statute. The word 'violations,' which encompasses the 'series of violations' that the jury had to find in order to convict under the CCE, covered two chapters of the Federal Criminal Code regarding drug crimes, which involved approximately ninety numbered sections. Id. at 819, 119 S.Ct. 1707. Therefore, the CCE required that the defendant engage in a 'continuing series of violations' of a broad range of specified criminal statutes. Id. The Court was concerned that the statute's word '"violations" covers many different kinds of behaviors of varying degrees of seriousness,' and that failing to treat each violation as a separate element would create a risk that a guilty verdict might mask 'wide disagreement among the jurors about what the defendant did, or did not, do.' Id. The Court in Richardson noted that some of the various acts that may be alleged as violations for purposes of the 'series' requirement of the CCE statute encompass a wide range of activities. Id.

United States v. Davis, 306 F.3d 398, 413 (6th Cir. 2002). Concluding that the aiding and

abetting statute was "vastly different," the court held that jury unanimity was not required on the

precise acts listed in the statute: ". . . [T]he finite terms listed under 18 U.S.C. § 2 describe

various means by which the elements of the crime can be accomplished, and do not require jury

unanimity as to each of these terms." 306 F.3d at 414. See also United States v. Hart, 635 F.3d

850, 854-56 (6th Cir. 2011)(Richardson distinguishable in case involving 18 U.S.C. § 2422(b);

jury not required to unanimously agree on specific state law offense with which the defendant

---

[9]   Section 2 of Title 18 provides: '[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission or willfully causes an act to be done by himself or another is punishable as a principal."

"could have been charged" if he had persuaded the minor victim to engage in sexual activity).

In applying the VICAR statute, courts have identified the elements of the offense as follows: (1) a criminal enterprise exists; (2) the enterprise was engaged in racketeering activity; (3) the defendant committed the alleged violent crime; and (4) the defendant acted for the purpose of gaining, maintaining or increasing his position in the racketeering enterprise. See, e.g., United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994); United States v. Banks, 514 F.3d 959, 964 (9th Cir. 2008).

As the Sixth Circuit concluded in Davis, the CCE statute at issue in Richardson is "vastly different" from Section 1959(a)(3) of the VICAR statute. In Section 1959(a)(3), "assault with a dangerous weapon" and "assault resulting in serious bodily injury" describe two means by which the assault can be accomplished. Section 1959(a)(3) prohibits "assault" as the violent crime in aid of racketeering activity, and jury unanimity is not required as to the means of accomplishing the assault – "with a dangerous weapon" or "resulting in serious bodily injury."

Accordingly, trial counsel was not deficient for failing to challenge Count 65 or the jury instructions regarding that count. In any event, the Petitioner is unable to establish that he was prejudiced as a result of any failure in that regard because it was not reasonably likely that the instruction would have made any difference in light of the overwhelming evidence that he was guilty of both types of assaults. See, e.g., Berghuis v. Thompkins, supra; Wade v. Timmerman-Cooper, supra. The evidence indicates that the Petitioner assaulted Mr. Boyd with a homemade knife, leaving lacerations on his face, back and arm that required some 200 stitches. (Docket No. 863, at 1400-01, 1406-07, 1410-11, in Case No. 3:09-00244). Petitioner's argument is without merit.

Petitioner also argues that counsel should have challenged the Court's instructions to the jury on "assault to commit bodily injury" because that crime is not listed in the VICAR statute. A review of the jury instructions, however, indicates that the elements of "assault to commit bodily injury" are the same as "assault resulting in serious bodily injury:" The Court instructed the jury on that offense as follows:

> Assault to commit bodily injury requires the government to prove beyond a reasonable doubt the following essential elements:
>
> 1. The defendant intentionally or knowingly caused bodily injury to another; intentionally or knowingly caused another to reasonably fear imminent bodily injury or intentionally or knowingly caused physical contact with another and a reasonable person would regard that contact as extremely offensive or provocative; and
>
> 2. The defendant caused serious bodily injury to another.

(Docket No. 866, at 59-60, in Case No. 3:09-00244).

The jury instructions describing the offense were valid, and any challenge by trial counsel to the jury instructions on that basis would not have been successful, and the Petitioner was not prejudiced by any failure in that regard. See, e.g., Ludwig v. United States, 162 F.3d at 458.

5. <u>Failure to Raise Any Issues On Direct Appeal Challenging the Convictions and Sentences; and Failure to Seek Supreme Court Certiorari</u>

Petitioner argues that he received the ineffective assistance of appellate counsel based on the deficiency in the selection of issues to raise, the quality of the briefing, and the failure to file a petition for writ of certiorari in the Supreme Court.

In order to demonstrate ineffective assistance of appellate counsel, the Petitioner must show that counsel was objectively unreasonable in failing to pursue non-frivolous issues on appeal; and that but for counsel's failure to raise the issues, the petitioner would have prevailed. See, e.g., Smith v. Robbins, 528 U.S. 259, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000); Moore v. Mitchell, 708 F.3d 760, 776 (6th Cir. 2013).  Appellate counsel is not ineffective for failing to raise meritless claims. Moore, 708 F.3d at 776.

Petitioner argues that the five issues raised by counsel on appeal were relatively minor and of questionable merit, and that counsel should have challenged the life sentences he received on Counts 59 and 60.  Petitioner contends that counsel's weak arguments were tantamount to no appeal at all, and cites Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) to support his argument that he does not have to demonstrate his claims are meritorious to succeed.

In Flores-Ortega, the Supreme Court reiterated prior decisions that it is "professionally unreasonable" for a lawyer to fail to file an appeal when specifically instructed by a client to do so. In such a case, the defendant is entitled to a delayed appeal and need not show any likelihood of success on its merits. Id.  In reaching its decision, the Court made clear that the complete denial of counsel during a critical stage of a judicial proceeding – the direct appeal in a criminal case – mandates a presumption of prejudice.

The Petitioner's complaints about the deficiency of the brief filed by counsel on direct appeal are a far cry from a complete denial of counsel on appeal. The Petitioner must, therefore, demonstrate prejudice.

In order to demonstrate prejudice, Petitioner must show that the issues appellate counsel

failed to raise would have been meritorious on appeal had he raised them. As explained herein, however, the issues Petitioner has raised, and contends counsel should have raised, do not warrant relief, and therefore, Petitioner has failed to demonstrate any prejudice resulting from appellate counsel's alleged failure to raise the issues. See, e.g., Spikes v. Mackie, 541 Fed. Appx. 637, 652 (6th Cir. Nov. 7, 2013); Smith v. Robbins, 120 S.Ct. at 764 n. 14 (The court need not consider the performance component first if it is easier to dispose of an ineffectiveness claim on the ground of insufficient prejudice).

Petitioner also argues that appellate counsel was ineffective for failing to seek review in the Supreme Court by filing a petition for writ of certiorari. The Supreme Court has held, however, that a defendant does not have a constitutional right to have counsel pursue a petition for writ of certiorari. Wainwright v. Torna, 455 U.S. 586, 587, 102 S. Ct. 1300, 1301, 71 L. Ed.2d 475 (1982); Ross v. Moffitt, 417 U.S. 600, 617, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). As the Petitioner has no right to counsel to pursue review in the Supreme Court, he cannot be deprived of the effective assistance of counsel for failure to pursue that review. See, e.g., Washpun v. United States, 109 Fed. Appx. 733 (6th Cir. Aug. 31, 2004).

The Petitioner claims that counsel was required to seek review by Sixth Circuit Rule 12, which governs counsel's representation in criminal cases before that court. Specifically, Rule 12(c)(5) provides: "Appointed counsel must file a petition for a writ of certiorari in the Supreme Court if the client requests it, and, in counsel's considered judgment, there are grounds for seeking Supreme Court review." In a letter to the Petitioner, dated January 15, 2014, and filed in the record by the Petitioner (Docket No. 1-1, at 72 of 74), counsel enclosed a copy of the Sixth Circuit's opinion affirming the judgment in Petitioner's case, and advised the Petitioner as

follows:

> I have reviewed the opinion, and there are no issues that I am aware of which would warrant an application for appeal to the United States Supreme Court. However, should you want to appeal the decision, you may file a Pro Se petition with the United States Supreme Court which must be filed within ninety (90) days from the date of the court order.

Assuming the Petitioner can pursue a violation of the Sixth Circuit Rule in a Section 2255 action, the Court concludes that he has failed to establish such a violation. Counsel clearly explains in the letter that in his "considered judgment" there are no grounds for Supreme Court review. Thus, the Rule does not require that he seek review.

For these reasons, Petitioner's ineffective assistance of appellate counsel claim is without merit.

## IV. Conclusion

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief under 28 U.S.C. § 2255, and that Petitioner's Motion Under § 2255 should be denied and this action dismissed.

Should the Petitioner give timely notice of an appeal from this Memorandum and Order, such notice shall be treated as a application for a certificate of appealability, 28 U.S.C. 2253(c), which will not issue because the Petitioner has failed to make a substantial showing of the denial of a constitutional right. Castro v. United States, 310 F.3d 900 (6th Cir. 2002).

It is so ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE